Your Honor, may I please the court? Thank you. Your Honor, this is an asylum case. My client, Ms. Mkrtchyan, was persecuted in her country because she complained against government authorities, complained against government authorities' illegal activities, and thereafter she was persecuted in many occasions. She was mistreated, she was imprisoned, she was sent to the hospital, she was beaten, she was subjected to violent acts of the government as punishment. This case went before the immigration judge, and the immigration judge denied my client, Ms. Mkrtchyan's, claim for asylum based on the fact that the judge did not find her credible. Then the case went before the BIA, and the BIA affirmed the judge's decision without opinion. So today I'm here to discuss why the immigration judge was incorrect. The judge indicated ten specific points for which he thought that the respondent should have answered differently, or the result should have been different, and that's why he found her not credible. And I'm going to go over each one of these points. I find that if we conclude that of the ten, I thought there were 14, but of the number of determinations he made, that one is fully supported by substantial evidence in the record, then we have to affirm, do we not? Well, even if one of these does – is supported by the record, Your Honor, then I still don't think that any one of these reasons are enough to find my client not credible, because none of these issues go to the heart of the matter, Your Honor. And I think that refugees could make mistakes, and this Court has found in the past that one or two mistakes that are – that are minor should not affect the credibility of the client, and the client or the refugee or the person who's asking for asylum should not be basically denied asylum just for one or two minor inconsistencies. The trouble with minor inconsistencies is that's how people get trapped. They often keep the major details of the story correctly, but cross-examination brings out minor inconsistencies which tend to reflect on the lack of credibility. People have – you know, contrary to what we sometimes see on television, people don't say, I lied, you know, I admitted that, you know. That only happens in paramation. I'm not even sure it happens in television these days anymore. So, you know, that's – that's how credibility works. That's how we – based on his own speculations. A few of these inconsistencies are because the immigration judge made an error in looking at the facts and looking at the prior testimonies. This respondent testified on two different occasions, two months apart from each other. And then a few of these inconsistencies were because the immigration judge maybe was forgetful or misunderstood the facts or took incorrect notes. And I could pinpoint to these and I could show them by the record and the exhibits that were entered into the record that these were actually only the immigration judge's mistake. I have three of them circled. If you want, I could cover these three, and then I could go on with the others. And these three are regarding dates. If I may, Your Honor, the first inconsistency that was completely incorrect decision by the judge was when the respondent testified as to whereabouts of her husband. In her testimony during October 2000, the respondent testified – my client, Mr. Petitian, testified that her husband was in Russia. And this is in the transcript, page 239. In January, she returned, and this is clearly, again, in the transcript on page 293. She says, my husband is in Armenia now. And the judge did not notice the word now when she was making the decision and used this as an inconsistency, indicating that the respondent once had indicated that the husband was in Russia. Now, she indicates that the husband is in Armenia. But she did say now on page 239, Your Honor. That's one that I think is a mistake of fact, Your Honor. Another one that is, again, related to the dates is a mistake of date of the mission in Karabakh. The immigration judge indicated that respondent had said during her statement that the mission took place sometimes in January. However, if you look at the transcript on page 280, respondent did indicate that the raid took place in February 16th. And if you look at her written application, which is, I think, Exhibit 2, Your Honor, the application also indicated that the raid took place early in the morning of February 16th. So, again, the IJ came up with January date, but we do not understand. He also seemed to have difficulty reconciling the fact that she goes on this trip to Karabakh representing the government, while at the same time she is criticizing the government for corruption. Absolutely, Your Honor. That is the third point that I was going to cover, Your Honor. And, again, this is a mistake of fact. My client, Ms. Mukherjee, indicated that she was first sent to this mission in Karabakh, and then she started complaining. She had her suspicions, things that happened. She had seen, she had heard of mistreatment, and she had heard about the soldier who was killed by the general, but she hadn't complained at that time. So she was still working for the government. When she went to Karabakh, upon her return, she started writing her complaints. So my client was consistent. Her statement was consistent. It was rational. It made sense. And it was also consistent with her application, Your Honor. These were actually the three points that I thought there were mistakes by the immigration judge. The others have explanations for them. Let me ask you one thing. It seemed odd to the I.J. that she should go to Karabakh with this small team to do the investigation authorized by the hospital. The I.J. said, well, hospitals deal with people after they've been hurt. They don't deal with people before they've been hurt. So why does this make sense that this would be a team from a hospital? What am I to think of that? The hospital was a government hospital, Your Honor, and she was also active politically. So if the I.J. thought that this is odd, he may be correct that it may be odd, but that doesn't mean that it did not happen. A lot of things happen everywhere in the world that they seem odd from distance, but that's just the way things are done in that place at that period of time. I mean, we're talking about a completely different culture and a completely different way of living life. Now, one thing I want to go back to your second point is to say the date of the raid in Karabakh. The I.J. thought that she testified that it took place in January and that she later testified that it took place in February. As I read her testimony, I just want to reinforce what you said on this point. Her testimony was that there was training for the raid in January, in February, but she never testified that the raid took place any time other than February. That's correct. I think the I.J. just got it flat wrong. He misremembered the testimony. You're absolutely correct, Your Honor. May I quickly point to the other – one other reason the I.J. denied the case was the documentary evidence. Clearly, the country condition – and the I.J. said that the country condition said – indicated that there was a ceasefire in that country at the time. So how could there be an – a military activity? But the Respondent, my client, Mr. Mukherjee, clearly indicated that this was an illegal activity, and the only difference is that the illegal activity was protected by the government or the government could not do anything against these people. And actually, the country condition and numerous other articles that my client – Ms. Mukherjee submitted to the court in Exhibit No. 3, one by one, Your Honors, indicate that Armenia at the time was a corrupt country. Corruption was widespread. Violence, torture, mistreatment, and mafia acts were all widespread in Armenia at the time. So actually, the documentary evidence do help my client to be found more credible at this point. Counsel, speaking of documentary evidence, you recall that your client testified. She had written a letter to the prosecutor informing him of the bribe, and the I.J. asked for a copy of the letter, and she says, I was not able to keep papers with me I had kept, but I couldn't pick them up and bring them. And then it turns out that she's able to give very, very detailed copies of the records of her hospitalization. Isn't that a discrepancy that really goes to the heart of the case? Well, Your Honor, I don't think – I agree with you that it may sound like that, Your Honor, but in reality, she just did not have those documents. Just by not having the documents and having some other document, we can come to the conclusion that because she has a document that is very detailed and she does not have copies of another document, then we have to find her not credible, Your Honor. Okay. Thank you. We'll hear from the government. Thank you very much, Your Honor. The Court please. I am Marshal Tabor Golding of the Department of Justice, representing the Respondent in this case. My starting point would be this. I think in a credibility case, what we need to start with is an understanding of just what a credibility determination is, what it involves. It is, to begin with, an evaluation of whether the story upon which an applicant's case is based is a truthful one. This is, in fact, is the very first step for making a – You know, we deal with these cases all the time. We understand this. Can I talk about the actual case we have in front of us? Well, with your indulgence, Your Honor, I've seen enough decisions from this Court which don't seem to understand what a credibility determination is, and I think it is important. We're in the upper half of the class. Pardon me? We're in the upper half of the class. We understand that. We're in the upper half of the class. We understand. Oh, well. Why don't you answer? Why don't you listen to Judge Fletcher's question? I have a question as a lead-in. I read the transcript, and then I reread it last night. One of the things that struck me was that this I.J. – I don't know the I.J. otherwise than in this transcript – and finishes impatient and hostile. You undoubtedly read the same transcript. He hardly lets the attorneys for either side ask any questions. At two points, he asks Mr. Lopez, the attorney then representing the petitioner, is it all right if I ask the questions? And poor Mr. Lopez says yes. What else can he do? Then the I.J. complains that the story has come out in a disjointed way. Well, I'll tell you why it comes out in a disjointed way. It's because he kept asking these questions. He says at various points – I'll just give you a couple of them – they're reconvening for a hearing, and her lawyer is not there yet. In short, he left the courtroom. You can't find him. This is the judge to the client. Is that right? He has another case. He told me he'd be here in 15 minutes. I.J., I see. Well, it's always nice to know that I'm second choice. I will repay the favor. Madam, you have two choices. You will either represent yourself now or we will postpone the case so you can explain to your lawyer that I do not take second place to any other judge, anytime, anywhere, especially in an expedited asylum hearing. Then Mr. Perez shows up. Mr. Perez, it's always nice to know that I'm second choice for every lawyer in some other courtroom in which to be, da-da-da-da-da. Later, we get a – she's working through a translator. The translator says, after, da-da-da-da-da, I'm now on page AR-287, after – this is an answer. Again, he threatened them. He beat them. He also injured them. Question. Okay. This, again, was the judge. And answer. And he also injured R. Davison with his gun. Question. This is the judge. What does that mean? I mean, Madam, forgive me, but in the world of your language, does that mean that injured him with his gun? Do you mean he shot him? Answer. Yes, he shot. This is working through a translator. What is – most IJs are patient, civilized, doing a good job under adverse circumstances. This transcript is an IJ who is impatient and hostile, beginning to end. What am I to make of this? And how am I to feed that into what are obviously a series of just factual mistakes that he makes about what actually was testified to in front of him? With all due respect, unless you are thinking that that is a due process violation. I'm not talking about a due process violation. I'm talking about an IJ who couldn't let the lawyers try their own case. After he asks the questions, he complains that the testimony is disjointed and uses that as a ground for finding adverse credibility, and then mistakes a number of facts in front of him. Then I have to go back to my first point, because the question at issue here is, was her story, was the indices of credibility, in other words, the indices that she is telling the truth, were they so compelling that no reasonable fact finder could disbelieve her? And regardless of the faults of the IJ in this case, I submit that this is not such a case where the indices are that strong. To begin with, this is her story has a Kafkaesque quality to it, of a quionic endeavor on her part fighting seemingly the entire Armenian government. Of course, one of the things right off the bat is, she is saying that she was fighting the Armenian national, the AMN at any event. And at this time, they were no longer in power. Their president had resigned. The party had broken up. This is all in the State Department report. Secondly, she makes the improbable assertion. Let me ask you this on this last point. This General Gregorian, do you know what his position now is in the Armenian government? I've never heard of him before. He's in the transcript right here. She says there's a General Gregorian. If you would look up who's now in the Armenian government, you would discover he's now Deputy Defense Minister. Well, that may be. But the point was, that may be. I'm not quite sure what difference that really makes. And it may not even be in the record. He's a defense minister. As a matter of fact, I looked at the record, and I didn't find it. But I might have overlooked it in the record. But what I am saying is her story is so improbable that you cannot say that applying that if this story were told to a man in the street, he'd be at the very least dubious. I remember a little refrain from when I was much younger. It may be so, but I don't know your story sounds so clear. That's exactly the case that you have here. Again, she talks about a general ordering a Maya incursion into Azerbaijan at the time that there was a ceasefire in place which was highly favorable to Armenia. And she suggests that her story is that this general would risk that, risk that ceasefire, and that if he did, that he wouldn't have been removed for incompetence. Now, again, she indicates that, again, her story is that this general personally undertook to punish these two soldiers. Now, it's possible, but I think the man in the street would look at it and find that rather dubious. It's generally this is the sort of thing which the general orders, but it's the captain or maybe the sergeant that carries out. I've listed a number of more of these in our brief. But what I'm saying, I'm sorry. Kennedy. Counsel, if I may, I suggest that it's not really up to us to test the implausibility of it. We're looking at a record, and it seems to me that your best argument is the inconsistencies that resulted from statements made by the Petitioner during the course of the hearings. Isn't that the basis upon which we come to? Well, what I am suggesting, Your Honor, is that in order to reverse, because the job of determining credibility is not given to an appeals court. It's given to the trier of fact, and that in order to reverse it, you have to say that the indices of credibility, the indices that she's telling the truth, are so overwhelming that no reasonable fact find to put doubt that she's telling the truth. Well, you know, that's not quite our test, and you may disagree with our test. Our test is we look at all the reasons advanced by the I.J. for finding her incredible, and we must find that those reasons are not supported by the record. That is to say, we don't go through the record ourselves independently and find that it's credible or not credible. We look at the reasons given by the I.J. for his finding of incredibility. I suggest to you that under the Elias no reasonable fact find attest that this, that what I just proposed, necessarily must be the test. I also suggest that given the burden of proof, it's her burden to prove the truth and it's the applicant's burden to convince the fact finder that his story is true. And, therefore, if there's anything. Thank you. You are out of time. Would you like a minute for a bottle? You don't feel you have to take it. Your Honors, government also placed all their arguments on speculation just like the I.J. did today. The government indicates that the general could not be the one executing the soldiers, but we have seen generals and we have seen presidents in different countries personally executing people. I find it a little hard to believe that the general wants to shoot these two soldiers, manages to get one but not the other, and then the nurse manages to find the other guy, but the general who was out to kill him somehow can't find him and kill him himself. I find that a little concocted. You are absolutely correct, Your Honor. But, again, as to the general killing the soldiers, executing them, maybe he was giving a lesson to the other soldiers, like Saddam Hussein has done many, many times, as to the reason why she was able to find the soldier and why she was. It wasn't a very good lesson. He missed one, you know. Well, you are correct, but at least my claim was not inconsistent. My concern is not so much that he missed. I mean, there's a general there and he's got a bunch of soldiers and these two guys that he wants to kill, supposedly. I would think that between them they could manage to kill these two guys. Instead, they both get away, one of them wounded. But then even if you accept that, you would think the general is really out to get these guys because he thinks that they deserve killing, that he doesn't tack them down. I mean, one winds up in a hospital wounded and maybe survives. Died, passed away. Well, but couldn't survive. That's correct. I don't mean maybe. Okay. You know, he wounds somebody. You don't know whether he's going to die or live, right? So if you really want him dead, you go after him, make sure he's dead. And that one who doesn't get wounded at all, so he doesn't disappear in the woodwork so nobody can find him, the nurse finds him. She has no trouble finding him, but the general sort of forgets about him. I find that a little impossible. Your Honor, you're absolutely correct. But, again, there are two points here that we have to look at. First of all, that part of my client's testimony is hearsay. What she has been told she has put on paper with regards to those facts, how the event happened, how he escaped. She may not know every detail and every fact, and maybe it was not even interesting to her to find out exactly what happened with regards to those sequences of the events. Second, we have refugees in these countries, many of them who fled their own countries, but now they are here and nobody comes after them. So there may be a reason for the general not going after the soldier in Russia. And, again, whatever my client says with regard to that part of the story, what she heard, what she put on paper, important is that she was consistent during her testimony and her statement with her statement in her asylum application. I thank the Court for your time. Thank you.
judges: Kozinski, O'scannlain, W. Fletcher